## H. J. McCARRON v. STATE.

No. A-9134.   April 16, 1937.
(67 Pac. [2d] 461.)

Glen O. Morris and Priest & Belisle, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and S. T. Roberson, Co. Atty., for the State.

BAREFOOT, J.   The defendant was charged, and tried jointly with one Vic Long, with having stolen from George Ulfers, in Canadian county, the following described property, to wit: "One light yellow Jersey yearling, weight about 460 pounds, no marks or brands, and one two year old half Jersey, light red color, weight about 720 pounds, muley."   He was sentenced to serve a term of three years in the penitentiary.

It is first contended by defendant that there was a variance between the property as described in the information, and the evidence offered at the trial. The prosecuting witness, George Ulfers, testified as to the description of the property, as follows: "One of them was yellow, was light yellow, with little horns, a yearling; the other was two years old, a muley, and light color." "The yearling weighed about 460 and the two year old weighed about 720." "The other one was a muley, but still he had little buttons."

Mr. D. C. Oldham, who hauled the cattle for the defendant to the stockyards at Oklahoma City, testified with reference to the description, as follows:

"Well there was one that looked like he might have been a yearling, he was about 550 I guess, 560 or something of that kind, and the other about 600 or 700, something like that. One of them looked about half Jersey, something like that, the least one; the other one was a little better grade, he was about a quarter Jersey, I don't know, he wasn't more than that any way, didn't look to be. He was between light red and a dark, he wasn't real dark; the other one wasn't real yellow, he was kind of real light Jersey looking. One of them had horns about 5 or 6 inches long, the little one, the other one had stub horns, little stub horns."

The defendant testified, as to the description, as follows:

"Q. One of them had horns and one was a muley? A. One was a muley. Q. What was their color? A. Light red. Q. Was there Jersey in either of them? A. There could have been. Q. What is your judgment? You are a cattle man. A. Well, there was Jersey in both of them. Q. One of them was half Jersey, was he not? A. There was a half Jersey—I said I thought they both had Jersey in them."

It will be seen that there is some slight difference in the description of the cattle, but in general terms the description is about the same. We do not think there is any substantial variance between the evidence offered as to the description of this property, and the allegations of the information.

The evidence in this case reveals that the prosecuting witness, George Ulfers, was a farmer, living in the south part of Canadian county, on Highway No. 41, which is east from Union City to Oklahoma City; that he had about 23 head of cattle in a pasture on the highway, and that about March 1, 1935, Vic Long, a codefendant, came to his place for the purpose of buying cattle; that on this occasion he sold him two heifers, and that he carried them away in a trailer which he had attached to his car at that time; that upon this occasion the said Long tried to buy a steer from him, this being one of the steers that was afterwards stolen from his pasture. He refused to sell him the steer. George Ulfers further testified that he saw the 23 head of cattle in his pasture on Tuesday morning, April 2, 1935, and that on Thursday, April 4, 1935, when he next saw them, two were missing; that they were the two heretofore described. On Friday, the 5th day of April, he examined his pasture fence and on the north side, next to No. 41 Highway, he found a place where the top wire had been cut, and the second wire from the top was loose. He found trails and tracks indicating the place where the cattle had been loaded. The witness testified that the tracks made by the trailer were very similar to the tracks made by the trailer tires that Vic Long had at the time he purchased the two heifers, and that both tracks were diamond tread tracks. The evidence also showed that the deputy sheriff, Mr. Moreland, who was with him, found a part of a rope near

where the cattle had been driven into the trailer, and near the same spot found one of the horns or buttons that had been knocked from the older steer. That on Monday, April 9th, the witness and Mr. Moreland, a neighbor who was a deputy sheriff, came to Oklahoma City for the purpose of investigating in reference to the stolen property. That they went to the house of the defendant Mc-Carron, and there saw a trailer with diamond tread tires, and two ropes which were identified at the trial as being ropes with which the cattle were tied at a certain point southwest of the packing plant at Oklahoma City on April 5th. The witness Walter W. Moreland testified to making an examination of the premises where the cattle were placed in the trailer and to the finding of the rope and the small button or horn, and of coming to Oklahoma City with Mr. Ulfers on Monday, April 9, 1935. He testified with reference to a conversation had with the defendant on the 10th day of April, the date he was arrested, that he asked the defendant if he sold these cattle on the 4th or 5th, and that the defendant answered that he did not know; he was about half drunk and did not know just what date it was that he had sold them. In the conversation with the defendant McCarron, defendant said, "Do you reckon Long has double-crossed me," and that the defendant made this same statement again on the same date. He also testified that the rope found in Mr. Ulfer's pasture was like the rope that was in the trailer.

D. C. Oldham, a witness for the state, testified that he lived in Oklahoma City, and was engaged in trading, buying, selling, and trucking; that on the morning of April 5, 1935, Speck McCarron, the defendant, came to his place before he had breakfast and employed him to haul a couple of yearlings from out at the edge of town; that after he had his breakfast he met McCarron at the

pool hall; that he was a little slow in getting ready and McCarron came back to his house, and as he went out to get in his truck he saw the codefendant Vic Long coming up the lane, and that Mr. Long said, "We have got to hurry if we get those cattle in time to sell them before the market closes"; that they went out after the cattle and that they were about four miles from Packingtown, a little southwest of the airport, and were located just across the road from defendant McCarron's mother's farm. The cattle were tied to a fence post with ropes. The witness said that the defendant McCarron claimed that he bought the cattle and paid $50 for them. The witness hauled the cattle to the stockyards, where they were sold to Halliburton Company, and he received his pay of $2 for the hauling of them. The check for the balance of $39.18 was made out in the name of defendant McCarron, and indorsed by codefendant, Vic Long. The witness also testified that one of the steers had a nub horn, and had blood on the other side of the head. Other witnesses testified to the sale of the two steers on the Oklahoma City market on the 5th day of April, 1935; one of the checks being made to the defendant H. J. McCarron, for the sum of $39.18, and one check for $2 to D. C. Oldham, for the hauling of the steers.

Mrs. D. C. Oldham testified that she was the wife of D. C. Oldham, who hauled the cattle for Mr. McCarron, and that he came to their house about 6 or 7 o'clock on the morning of April 5, 1935; that she saw the codefendant Long there at the side of the house, but that he did not come in; and that she saw the defendant McCarron and the codefendant Long there three times. The third time she saw the codefendant Long he wanted some ropes, which had been left in the truck in which the steers had been hauled.

Floyd Oldham testified that he was the son of D. C. Oldham, and that he had known defendant McCarron and codefendant Long for seven or eight years; that he saw the defendant and the codefendant at his father's home. After his father hauled the cattle, the codefendant Long came there after some ropes that were left in his father's truck, and that he got the ropes for Long, the ropes which were identified by the witness as being the ropes that were in the truck, and with which the steers were tied in the lane near the home of defendant's mother. He testified to getting the ropes out of his father's truck and giving them to Mr. Long.

W. M. Golden testified that he was a deputy sheriff, and identified the ropes taken from Mr. Long's car, and that the defendant Long told him they were the ropes taken off of the cattle, but that the lariat rope was his.

The first witness for the defendant was his codefendant, Vic Long, who testified that he was engaged in the business of buying and selling cattle and had been for 25 years; he testified that he had been in Oklahoma City for the last twelve years; he formerly shipped cattle, but of late had been buying in trucks and trailers mostly; he testified of the going to the home of the prosecuting witness Ulfers to look at some cattle about March 1st, and to buying a couple of heifers from him at that time. He admitted that he tried to buy a steer from him, but that Mr. Ulfers refused to sell the steer at that time; that he was acquainted with the defendant McCarron, and had had many transactions with him, and that they had traded together in the streets for ten or twelve years; that they would buy and split the profits; he testified that he was at home on Wednesday and Thursday, April 3 and 4, 1935, and was sick with a little flu; that on the morning of April 6th, about 7 o'clock, he went to the

defendant McCarron's home and that they came to Packingtown together. He testified: That he got to McCarron's house about 7:00 o'clock and that it was about 7:30 or 8:00 o'clock when McCarron got out of the car at Packingtown and that about an hour later he met McCarron at a meeting place near the stock yards; that McCarron told him "that he had seen a fellow who had broke down out there, and who had some cattle he could buy worth the money"; that he gave McCarron his pocketbook, and that the pocketbook had $52 in it; that McCarron wanted him to go and get the cattle, but he told him that his trailer had a flat, and that it was at home, and for him to hire somebody else; that McCarron left, telling him that he thought he could get Mr. Oldham to haul the cattle; he admitted going to Mr. Oldham's house and said that he did so for the purpose of getting the cattle in so that they could be sold on the market on Friday before it closed. He admitted indorsing the check which was received for the cattle and cashing it at the stockyards bank. He stated that he did not know that there was anything wrong with these cattle. He identified certain tires that were introduced in evidence and were claimed to have been taken from his trailer and identified the ropes as being the ones taken from the truck. He remembered the day that he was arrested, April 10th, and that his trailer was over at McCarron's house Tuesday night, and when the load came back it was almost dark, and as he had no tail-light he did not want to take it through town.

The defendant McCarron testified in his own behalf. He corroborated the testimony of his codefendant Vic Long, and especially in reference to going with him to Packingtown early on the morning of April 5th; that after he got out of Long's car at a beer or sandwich shop

back of the bank building, a fellow hollowed at him and asked him if he would buy a couple of cattle; that he told him he did not know whether he would or not, and that the man asked him if he knew where he could get a truck to haul them in, and he told him of a man by the name of Coffer that he might get to haul them in; that he went into the beer joint and drank several glasses of beer, and that Vic Long came back in; that he told Vic Long of the offer he had just had in reference to the cattle, and Vic told him that he had the money, and thereupon handed him his purse, and he left to see the cattle owner; that he went out and found the owner of the cattle, down by the post office; and the owner told him the truckmen had never opened up; that he then told the cattle owner that he would look at the cattle, and they went out to see them, about a half mile south of Portland avenue, on the south line of the defendant's mother's property. He testified that he never knew the name of the man who owned the cattle and never at any time asked him what his name was; that he was driving a 1929 or 1930 Chevrolet coupe; that he finally bought the cattle for $50, and paid cash for them. He testified that he stayed at the beer place 30 or 40 minutes; he said that it was about 10 o'clock when he and Oldham went after the steers. He testified that he went with a man whose name he did not know, to see the steers before buying them. He testified on cross-examination that he had been convicted of driving a car while drunk, and several times for being drunk, and that these were the only offenses that he had been convicted of, or pleaded guilty to. He claimed that he had never seen the steers before that morning.

Certain other witnesses testified for the defendant, testifying to hearing conversations between the defendant

and codefendant Long that tended to corroborate the testimony in reference to the defendants being about to purchase some cattle from some one, and the codefendant Long giving him his pocketbook. Certain other witnesses testified to the good reputation of the defendant.

Mary Simpson testified for the defendant, saying that she stayed all night at Mrs. McKenzie's, being the place where Speck McCarron lived, on the night of April 4, 1935, and that she saw the defendant between 12:30 and 1:30 that night; that Speck came in and that they sat there and talked, and after talking awhile she looked at the clock and told Speck that he had better go to bed, that it was a quarter until 2; and that Speck was there at home the balance of the night.

Part of the evidence in this case is what is known in law as "circumstantial," but in cases of this character it is often necessary to prove some of the essential facts by circumstantial evidence. The jury heard all of the testimony and had the opportunity to observe the witnesses on the stand, and heard the testimony of the defendant and his codefendant, and after due deliberation found the defendant guilty. They did not believe the story he told in reference to buying the steers from some man whom he did not know and whose name he did not ask. They evidently found that he had an opportunity to commit this crime before he returned to his home on Thursday night, April 4th, at from 12:30 to 1:30, as testified to by those who were at his home that night.

This court has uniformly held that where a conviction rests largely upon circumstantial evidence, and where circumstances are proven from which the reasonable and logical inference of guilt clearly arises, and which exclude any reasonable hypothesis except the guilt of the accused,

although the evidence is conflicting, the court will not disturb the verdict for insufficiency of the evidence. Gourley v. State, 49 Okla. Cr. 24, 292 Pac. 873; Halbert v. State, 35 Okla. Cr. 329, 250 Pac. 436; Coppler v. State, 52 Okla. Cr. 275, 4 Pac. (2d) 700; Gentry Webb et al. v. State, 54 Okla. Cr. 150, 16 Pac. (2d) 261.

Defendant complains that the court erred in the giving of certain instructions and its refusal to give certain requested instructions. We have very carefully examined the instructions given and those requested, and we find that the court instructed the jury that the mere possession of recently stolen property is not, in and of itself, sufficient to establish the defendant's guilt, but is only a circumstance to be taken into consideration together with all the other facts and circumstances in arriving at the guilt or innocence of the defendant. This instruction, together with all the instructions given, including one upon circumstantial evidence, properly protected the defendant as to the defense made in this case. In the case of Underwood v. State, 23 Okla. Cr. 119, 212 Pac. 1010, 1012, the court says:

"While it has been held by this court that, when requested, the defendant is entitled to an affirmative instruction covering the defense interposed, and it would be reversible error to refuse such instruction when requested, yet in this case the defense interposed was not in its nature affirmative, but amounted merely to a negation of guilt, and for that reason we are of the opinion that the trial court's instructions, requiring the state to prove guilt beyond a reasonable doubt as against the presumption of innocence, were sufficient."

The contention that the remarks and conduct of the county attorney were such as to constitute prejudicial error cannot be sustained. The record does not show that

274

exception was taken at the time that the argument was made, and the only proof is by evidence at the time that the motion for new trial was passed upon. This court has often held that this does not constitute error.

From an examination of the record in this case, we are of the opinion that the defendant had a fair and impartial trial and the verdict of the jury should be permitted to stand.

It is therefore ordered that the judgment of the district court of Canadian county be affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.